## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ERIC ANDREW PATE and )
TODD J. STROYAN, )
)
    Plaintiffs, )
)
    v. )    Case No. 06 C 3699
)
VILLAGE OF HAMPSHIRE, )    Judge John W. Darrah
HAMPSHIRE POLICE DEPARTMENT, )
THOMAS F. ATCHISON and )
JEFFREY R. MAGNUSSEN, )
)
    Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Eric A. Pate and Todd J. Stroyan, filed suit against Defendants, alleging violations of their due process property interest (Count I), violation of Pate's due process liberty interest (Count II), violations of their First Amendment right of free speech (Count III), and breach of contract. Presently pending before the Court is Defendants' Motion for Summary Judgment as to Counts I, II, and III.

### FACTS

Pate and Stroyan were employed by the Hampshire Police Department ("Police Department") as full-time police officers. Pate began his employment with the Police Department in July 2002, and Stroyan began his employment with the Police Department in November 2001. Pate's and Stroyan's employment with the Police Department were terminated on May 5, 2006. (Def.'s 56.1(a)(3) Statement ¶ 1). At that time, the chain-of-command at the Police Department consisted of Chief of Police Thomas F. Atchison, Lieutenant Brian Thompson, and Sergeant Brian Ferguson and Sergeant Hobart Jones. (Id., ¶ 8). At the time of their termination, Pate worked the day shift

with Lieutenant Thompson and Police Officer William Hentschel, and Stroyan worked the midnight shift with Sergeant Ferguson and Police Officer Peter Velez. (Id., ¶¶ 10-11). The Village of Hampshire's government consisted of the Village Mayor, Jeffrey Magnussen, and six trustees. (Id., ¶ 9).

Pate was the union steward for International Union of Operating Engineers, Local 150. Pate and Stroyan were responsible for bringing the union to the Police Department in December 2004. Pate and Stroyan were the representative negotiators when the contract was being discussed. (Plaint.'s 56.1(b)(3) Statement ¶ 17).

In late 2005 or early 2006, Officer Velez told Sergeant Ferguson that he was going to quit the Police Department because of the actions of other police officers. (Def.'s 56.1(a)(3) Statement ¶ 23). Officer Velez stated that he was leaving the Police Department because Pate and Stroyan were bringing down the morale of the department and that he did not want work in that type of environment. Officer Velez indicated that Pate and Stroyan were making disparaging statements on a continuing basis about the entire department, including Chief Atchison and the Village.

Officer Velez provided several examples of statements Pate and Stroyan made that led him to intend to leave the Police Department. (Def.'s 56.1(a)(3) Statement ¶ 24). The next day, Sergeant Ferguson spoke with Lieutenant Thompson and told him his concerns about Officer Velez's intentions to quit the Police Department based on the actions of two other police officers. At a later date, Sergeant Ferguson presented a memo to Lieutenant Thompson that outlined some of the things that were being said to Officer Velez by Pate and Stroyan. In part, he indicated that Officer Velez told him that Pate called him after Sergeant Jones had been in an accident and stated that he hoped that the accident would either kill Sergeant Jones or force him out of working in the Police Department. Pate

2

and Stroyan also made comments that if Chief Atchison ever died, they would throw a pizza party and not at all be sad. Lieutenant Thompson directed Sergeant Ferguson to talk with Officer Velez to get more information. (Id., ¶ 25). At that point, Lieutenant Thompson notified Chief Atchison of Officer Velez's concerns; and Chief Atchison authorized an investigation of Pate and Stroyan. (Id., ¶ 26).

Officer Velez prepared a memorandum and submitted it to Lieutenant Thompson on April 29, 2006. The memorandum provided examples "regarding the negative issues, comments and behaviors" Officer Velez witnessed while working in the Police Department, including: (1) there are several tools left out that are visible to a subject in custody that may be used against an officer – Stroyan mentioned this to the administration months ago, but nothing had been done; (2) in the past year-and-a-half there have been three range qualifications and one training session – Chief Atchison has only qualified once since his induction as chief several years ago, and he just pays the bill for the range but does not seem to care to utilize the facility; (3) Chief Atchison does not want to answer calls or take reports, for example, upon Officer Velez's arrival at a call near 200 Old Mill Lane, he met the complainant, who handed him Chief Atchison's business card and explained that Chief Atchison stated to the resident to call back after 3:00 p.m. when an accident investigator was on duty; (4) Pate had stated that Chief Atchison never assists him with early morning calls for activated alarms and accidents; (5) Stroyan told him that he passed Chief Atchison on State Street, lights and sirens, en route to a suicidal subject with a knife on Bailey Lane, and Chief Atchison continued on without inquiring about the situation; (6) Pate explained that the Police Department has a poor relationship with the Gilberts Police Department and the Kane County Sheriff's Department due to Chief Atchison's burning all his bridges with those agencies; (7) communication

3

channels between the police officers is not present due to several factors, including observing Pate's and Stroyan's not acknowledging Chief Atchison in the mornings, Pate's and Stroyan's stating they would prefer not to see or talk to Chief Atchison, and Pate's and Stroyan's exhibiting the same behavior toward Sergeant Jones; (8) he was told that Sergeant Jones was handed his position and that he has no idea how to be a supervisor; (9) Sergeant Jones telephones the lieutenant every time before he makes a decision; (10) Sergeant Jones' failure to "show up" at a call, and he was told that Sergeant Jones is stupid and scared so you can't count on him; (11) he was advised that the radio license expired three years ago, and the department could be in jeopardy of losing that service – he was concerned that it took nearly a year to put the radio in the garage; (12) he was told that the reason a certain program was taken away from patrol officers' access was due to the administration's being jealous because Stroyan and Pate knew the system too well; (13) he was shown two receipt faxes that were left next to the fax machine regarding officers' safety intelligence bulletins as to felonies committed with a handgun – he was advised to check the fax machine frequently because imperative information like these faxes is usually not forwarded to the patrolmen; (14) after seeing squad cars put out of service, he was told the equipment is old and outdated and that Chief Atchison has a poor relationship with the Village Hall so he is reluctant to seek approval of purchase orders for new equipment; (15) he was told about a lack of equipment, including no orange cones, flares, or traffic vests; (16) he was told the Police Department rarely provides any specialized training – Stroyan and Pate stated that since starting at the Police Department, they have had minimum training, at best; (17) Pate informed him of a dusty box full of picture frames in the garage and stated that if he was killed in the line of duty that they (the administration) would find a spot in the box next to Greg Sears' mementos; (18) he was told Chief Atchison never attended Village Board meetings prior

4

to Mayor Magnussen's being elected because Chief Atchison "doesn't care about making his troops happy" – he was told that the Fire Chief always attends board meetings even though the fire department is not a Village department because the Fire Chief cares; (19) Chief Atchison is very vindictive and enjoys playing mind games; (20) police officers never know their uniform allowance balance and must get approval before using it; (21) he was informed that if an officer leaves his department, Chief Atchison will have nothing but negative statements about the officer to perspective employers; (22) officers cannot visit the fire department or village hall; (23) 12-hour shifts were eliminated because the officers have more days off than their supervisors; (24) Drug Abuse Resistance Education ("DARE") Officer Stroyan was put on the midnight shift, and it is extremely rare to have a DARE officer on nights; (25) Officer Hentschel's start date was changed to give him seniority over Stroyan; (26) the testing procedure was not followed for the recent sergeant position, and it was approved that the officer with the least seniority (Maki) be assigned to detective; (27) there was no compassion when Stroyan was demanded back to work after his son was born with several complications; (28) termination of all part-time employment and telephoning the Genoa Police Department and advising Chief Solar that Pate could no longer work as a part-timer before informing Pate; (29) when Officer Ferguson was a patrolman, he was threatened with a suspension because of his lack of activity, but his administrators have consistently shown less activity than Officer Ferguson; (30) lack of communication in regards to schedule changes; and (31) he was advised by Pate that there was a retention study done prior to his arrival and that history was repeating itself due to Chief Atchison's acting exactly like he did with the Sugar Grove Police Department. (Def.'s 56.1(a)(3) Statement ¶ 27).

5

Sergeant Jones told Detective Maki that he wanted to interview him regarding comments made by Pate and Stroyan. Prior to this, Detective Maki had made verbal complaints about Pate to Sergeant Jones. These complaints started shortly after Detective Maki was hired at the Police Department in September 2005. (Def.'s 56.1(a)(3) Statement ¶ 29). Sergeant Jones instructed Detective Maki to write a memorandum, reflecting his observations of negative comments and behaviors that he had witnessed. In that subsequent memorandum, Detective Maki indicated, in part, that he heard Pate and Stroyan make the following comments: (1) Sergeant Jones was lazy, did not earn his stripes, and did not have what it takes; (2) Sergeant Ferguson was lazy; (3) "who would f___ that" in regards to Chief Atchison's girlfriend (now wife); (4) Chief Atchison was "out to get laid"; (5) and Chief Atchison just sat in his office and did not back up officers. (Id., ¶ 30).

Sergeant Jones asked Officer Pepper to prepare a statement regarding a phone call that he had received from Pate. Officer Pepper indicated that he received a voice message from Pate, indicating that someone at the Police Department was questioning whether Pepper had actually had surgery . Pate told Officer Pepper that he was giving him a "heads-up" about his job. Officer Pepper contacted Chief Atchison at home, and Chief Atchison assured him that his job was not in jeopardy. (Def.'s 56.1(a)9(3) Statement ¶ 31).

Lieutenant Thompson contacted Attorney Thomas McGuire for advice about how to proceed regarding the personnel matters involving Pate and Stroyan. Lieutenant Thompson knew of McGuire after he and Sergeant Jones attended a seminar that McGuire gave on internal investigations. (Def.'s 56.1(a)(3) Statement ¶ 32). Subsequently, the Village retained McGuire to provide legal advice as to the personnel matters involving Pate and Stroyan. (Id, ¶ 34). McGuire

6

met with the Chief in early 2006, at which time McGuire reviewed Officer Velez's written statement. McGuire recommended that Pate and Stroyan not be questioned and that there was no point in interviewing Pate and Stroyan because it would just come down to a credibility issue. (Id., ¶ 35).

After meeting with Chief Atchison, McGuire asked to meet with both Chief Atchison and Mayor Magnussen. At this meeting, McGuire and Chief Atchison briefed Mayor Magnussen about a meeting with Officer Velez. After reviewing the Village ordinances to determine if Chief Atchison had the authority to dismiss Pate and Stroyan, McGuire determined that Chief Atchison could only make recommendations. (Def.'s 56.1(a)(3) Statement ¶ 36). McGuire assessed whether or not Pate and Stroyan may have been exercising their constitutional rights to ensure that the advice he was giving his clients was such that they were not violating Pate's and Stroyan's constitutional rights. McGuire advised his clients that Pate's and Stroyan's employment could be terminated without violating their constitutional rights because Pate and Stroyan were disruptive employees and had a potential for further disruption. (Id., ¶ 37).

McGuire met with Officer Velez in Chief Atchison's office. McGuire questioned Officer Velez as to why Officer Velez was thinking of leaving the Police Department. McGuire questioned Officer Velez to determine if Officer Velez was credible, and he concluded that he was credible. (Def.'s 56.1(a)(3) Statement ¶ 38). McGuire had a final meeting with Chief Atchison, Mayor Magnussen, and the Village Attorney. At that meeting, McGuire recommended that Mayor Magnussen terminate Pate's and Stroyan's employment because they were disruptive employees and that there was potential for further disruption. McGuire stated that Pate and Stroyan were a "cancer within the department." (Def.'s 56.1(a)(3) Statement ¶ 39). McGuire recommended to move quickly because if Pate or Stroyan became aware of Officer Velez's comments, there could be

7

problems with retaliation. (Id., ¶ 40). In McGuire's opinion, Pate and Stroyan were at-will employees who could be terminated without violating their constitutional rights because they did not have a property right in their employment. (Id., ¶ 50). The Village Attorney was concerned about civil liability, and McGuire recalls that there was a concern raised about whether Pate and Stroyan were exercising their constitutional rights. (Plaint.'s 56.1(b)(3) Statement ¶ 19).

Acting on the advice of McGuire, Chief Atchison prepared a memorandum to Mayor Magnussen, recommending that Pate's and Stroyan's employment be terminated. (Def.'s 56.1(a)(3) Statement ¶ 41). Officer Velez's statements were the nucleus of his recommendation as he believed Officer Velez to be an honest police officer, but he also relied upon Officers Maki's and Pepper's memorandum. (Id., ¶¶ 42-43). Chief Atchison felt that Pate and Stroyan should be terminated because the comments regarding the supervisors being "handed their stripes" lowered the morale of the department. Chief Atchison also took issue with the comment regarding his girlfriend and the fact that Stroyan would turn his back on him when he would speak to him. (Id., ¶ 44). Chief Atchison knew that Pate and Stroyan were lowering the morale of the Police Department because Officer Velez was threatening to resign, and he had heard Pate and Stroyan say that they disliked Sergeant Jones. Members of the staff also told Chief Atchison that they were depressed because of the constant bickering and backstabbing coming from Pate and Stroyan. (Id., ¶ 45).

Mayor Magnussen recommended to the Village Board that Pate's and Stroyan's employment be terminated based upon the recommendations of Chief Atchison and McGuire and his review of the memoranda prepared by the other police officers. (Def.'s 56.1(a)(3) Statement ¶ 46). Pate's and Stroyan's employment was terminated with the approval of the Village Board. The consensus of the Village Board to terminate the employment was made on May 4, 2006, in executive session. The

8

decision was ratified on May 11, 2006. (Id., ¶ 47). In making the decision to terminate Pate's and Stroyan's employment, the Village Board reviewed the police officers' memoranda discussed above, listened to a recorded statement of Officer Velez, and had an open discussion about the matter. (Id., ¶ 49).

Pate and Stroyan were notified of their termination, in writing, on May 6, 2006. The notices provided that their employment was terminated for violation of Department Rule N2-34, On-Off Duty Conduct-Morale/Efficiency/Image/Public Confidence ("Rule N2-34"), which prohibited: "Engaging in conduct on or off duty which adversely affects the morale or efficiency of the Department or in the alternative, engaging in conduct on or off duty which has a tendency to destroy public respect for the employee and/or Department and/or destroy the confidence in the operation of the municipal service." The Board terminated Pate's and Stroyan's employment prior to the ratification of May 11, 2006, on the advice of McGuire. (Def.'s 56.1(a)(3) Statement ¶ 48).

During his employment with the Police Department, Pate made several statements that he contends were substantial or motivating factors underlying his termination. These statements include: (1) Chief Atchison does not care about the Village, officers, and general well-being of the public for the following reasons: (a) Chief Atchison does not show up for calls; (b) Chief Atchison does not back up officers; (c) Chief Atchison shot down employee morale by his refusal to backup officers during a bank alarm; (d) Chief Atchison refused to come to the aid of a citizen who was stranded along the side of the road; (e) and Chief Atchison told the citizen to call the police for help after 3:00 p.m, since he would be off-duty at that time; (2) the Police Department does not have good relations with the Village of Gilberts Police Department or Kane County Sheriff's Department because Chief Atchison told them not to backup either one and a lot of officers from Gilberts worked

9

for the Village of Hampshire and left as a result of Chief Atchison; (3) he would prefer not to deal with Chief Atchison; (4) police officers had to check the fax machines for officers' safety intelligence bulletins since such bulletins are not normally forwarded to patrol officers; (5) there is a lack of equipment, such as orange cones, flares, and traffic vests; (6) the Police Department rarely provides any specialized training to its officers and that he has had minimal training, at best, from the Hampshire Police Department; (7) Chief Atchison never attended board meetings prior to the election of Mayor Magnussen, whereas the Fire Chief always attended board meetings; (8) police officers never know their uniform allowance balance and must get approval before using it; (9) Chief Atchison does not allow police officers to visit the fire department or the Village Hall; (10) Chief Atchison changed Officer Henschel's start date in order to give him seniority over Officer Stroyan; (11) Officer Stroyan, the DARE Officer, was wrongly placed on the midnight shift; (12) there is a general lack of communication between the supervisors and the employees; and (13) Chief Atchison did inappropriate and/or improper things as the Police Chief of Sugar Grove, such as: he fixed speeding traffic citations for friends, he had an inappropriate relationship with a subordinate officer, and he was accused of being heavy-handed with employee discipline. (Def.'s 56.1(a)(3) Statement ¶ 12).

Pate would rather not work with Chief Atchison and thinks he is a liar and "a joke." Pate made comments to other police officers that could be characterized as negative about Chief Atchison. Pate made these comments while on duty or off duty at the department shift change. (De.'s 56.1(a)(3) Statement ¶¶ 13, 15). Pate stated, in Officer Maki's presence, that Sergeant Jones is lazy. Pate believes that Sergeant Jones should not have been made a sergeant and that he did not have what it takes to be a sergeant. Pate told other police officers that Sergeant Jones had no idea

how to be a supervisor. (Id., ¶ 15). Pate told Officer Velez that: (1) Chief Atchison never assists with early morning calls for activated alarms and accidents, (2) he would prefer not to see or talk to Chief Atchison or Sergeant Jones, and (3) he would not be sorry or sad if Chief Atchison dies because he just did not like the man. (Id., ¶ 15). Pate made additional comments to vent his frustration, including complaining that the Department showed a lack of compassion for Stroyan when he came back to work after his son was born with several complications and making statements regarding the lack of training and equipment at the department and the general vindictiveness Chief Atchison. (Id., ¶ 16). Pate respects Chief Atchison's position and rank. (Plaint.'s 56.1(b)(3) Statement ¶ 9).

During his employment with the Police Department, Stroyan made several statements that he contends were substantial or motivating factors underlying his termination. These statements include: (1) the police administration does not care about its police officers because there are several tools left out that are visible to a subject in custody that could be used against an officer and that his mention of this to the administration months ago was to no avail and that the administration rarely provides any specialized training and that he had minimal training, at best; (2) Chief Atchison did not assist in helping or even inquiring about a suicide victim; (3) he would prefer not to deal with Chief Atchison; (4) the radio license expired three years ago and that the Department was in jeopardy of losing radio service; (5) the police equipment is old and outdated; (6) Chief Atchison is reluctant to go to the Village Board to approve purchase orders for new equipment; (7) there is a lack of equipment, such as orange cones, flares and traffic vests; (8) police officers never know their uniform allowance balance and must get approval before using it; (9) Chief Atchison has given negative job references to individuals who leave the Department as he overheard Chief Atchison give

11

a bad reference for Officer Malloy; (10) Chief Atchison does not allow police officers to visit the fire department of Village Hall; (11) Chief Atchison changed Officer Hentschel's start date in order to give him seniority over Stroyan; (12) he was wrongly placed on the midnight shift; (13) there is a general lack of communication between the supervisors and the employees; (14) Sergeant Jones was handed his position, and Stroyan had the highest grade on the written test in the next portion of the test and was not going to jump through hoops until they got the guy they wanted; (15) what's the use of testing when you know who you want and you appoint them; and (16) a program was taken away because he and Pate knew how to run it, and they did not want them doing something they cannot do. (Def.'s 56.1(a)(3) Statement ¶ 17). These statements were made to police officers and members of the Police Department while Stroyan was on duty or to other police officers at shift change. (Id., ¶ 18).

Stroyan does not believe that Chief Atchison is a competent police administrator and made comments about the way things were run. Stroyan questioned decisions that were made by Chief Atchison and told others that he would prefer not to have any dealings with Chief Atchison. Stroyan believed Chief Atchison was vindictive and shared this belief with one or more police officers. (Def.'s 56.1(a)(3) Statement ¶ 19). Stroyan commented to other police officers that Chief Atchison would just sit in his office and would not back up other police officers. Stroyan believed that the administration of the Police Department did not care about its officers. He also told Officer Velez that he would prefer not to see or talk to Chief Atchison. (Id., ¶ 20; Plaint.'s Resp. ¶ 20).

Stroyan stated to Officer Maki, in substance, that Sergeant Jones was lazy and did not deserve his stripes. Stroyan preferred not to see or talk to Sergeant Jones. Stroyan told Officer Velez that Sergeant Jones was handed his position and had no idea how to be a supervisor and that in order to make a decision, Sergeant Jones had to call the Lieutenant to find out what to do. Stroyan also told Officer Velez that he did not like working with Sergeant Jones because Sergeant Jones did not like working by himself and seemed scared of handling calls on his own. (Def.'s 56.1(a)(3) Statement ¶ 21; Plaint. Resp. ¶ 21). Some of the comments that Stroyan made to other police officers were made to make the police officers aware of safety issues, were made for training purposes, were made to let the other officers know the way that department viewed things, and to just get things off his chest. (Def.'s 56.1(a)(3) Statement ¶ 22).

Sergeant Jones found that Pate and Stroyan always obeyed orders and that Stroyan was never disrespectful. Officer Hentschel never saw Pate or Stroyan refuse to acknowledge Chief Atchison. (Plaint.'s 56.1(b)(3) Statement ¶ 9).

The Hampshire Police Department General Order ("General Order") with the subject "Disciplinary Procedures" is contained in a document entitled "Hampshire Police Policies and Procedures" ("Policies and Procedures"). The General Order became effective October 1, 2005. (Plaint.'s 56.1(b)(3) Statement ¶ 3). This General Order provides, under the title "Review Process":

> a) Evaluate all appropriate department rules and policies to see if they are reasonable and related to the sustained offense(s);
> b) Conduct a fair and objective review;
> c) Fully review and evaluate any defenses or explanations that are offered by the affected employee;
> d) Apply rules and policies with fairness;

13

e) Recommend discipline which is corrective rather than punitive and which bears a rational relationship to the seriousness of the offense(s); and
f) Take into consideration the affected employee's prior performance and disciplinary record.

Historically, the Village has used progressive discipline in situations that involved a minor issue. (Id., ¶ 4). The General Order provides that the use of punitive actions is subject to the Rules and Regulations of the Hampshire Police Department and the Uniform Peace Officers' Disciplinary Act. No other statute, ordinance, or document is identified in that General Order. (Id., ¶ 6).

The General Order also provides that employees shall receive notifications of dismissals that result from internal investigations, unless the employees are "at will" or "probationary" employees. The notifications must include the reason for the dismissal, the effective date of the dismissal, the status of fringe and retirement benefits after dismissal and a statement as to the content of the employee's personnel file relating to the dismissal. Stroyan's and Pate's notifications of dismissal contain the reasons for the dismissals, the effective date of the dismissals, and statements about the "status" of fringe and retirement benefits after dismissal. They also contain implied statements as to the content of the employee's personnel file relating to the dismissal, in that the rationale for termination is set forth. Pate's notification of dismissal stated that he was being terminated because his conduct was "undermining the morale of the Department" and having "a disruptive effect on the office of the Department and working relationships of its officers." (Plaint.'s 56.1(b)(3) Statement ¶ 5). The General Order provides a right of appeal to the Village Trustees. Pate and Stroyan made a request for an appellate hearing but did not receive one. (Id., ¶ 7).

14

The General Order provides that "punitive discipline is a component of the disciplinary system that is generally imposed in a progressive manner from minimum to maximum but, when appropriate, may be imposed to the maximum limit without progression." (Def.'s 56.1(a)(3) Statement ¶ 51). Chief Atchison testified that the Policies and Procedures were not enforced at the Police Department and were used as a guideline. (Id., ¶ 52).

The Hampshire Police Department Rules and Regulations ("Rules and Regulations") provides, in pertinent part, "the right is reserved to the Chief of Police with the advice and consent of the legislative body of the Village to amend or revoke any of the attached rules and regulations and to make additional rules and regulations from time to time as the circumstances for the good of the service may require." (Def.'s 56.1(a)(3) Statement ¶ 53). The Rules and Regulations provide a list of acts that are "prohibited to all employees" and states that these acts "may be made the subject of disciplinary action." Rule N2-34 prohibited "engaging in conduct on or off duty which adversely affects the morale or efficiency of the Department, or in the alternative, engaging in conduct on or off duty which has a tendency to destroy public respect for the employee and/or Department and/or destroy confidence in the operation of the municipal service." (Id., ¶ 54). The Rules and Regulations also provides that "any member or employee who violates or attempts to violate a law of the United States of America, State of Illinois, local ordinances, or who violates or attempts to violate any rule or regulation, policy or procedure, general or specific order, written or verbal order, or who is incompetent to perform one's duty is subject to appropriate disciplinary actions." Dismissal is a penalty that may be assessed against any employee of the Police Department as disciplinary action. (Id., ¶ 55). The Rules and Regulations provides that the Police Department

15

"shall conduct a thorough and accurate investigation, and such investigation shall include a formal statement from all parties concerned." Pate's and Stroyan's statements were not taken as part of the investigation into their conduct that led to their terminations. (Plaint.'s 56.1(b)(3) Statement ¶ 15).

The Village of Hampshire's Personnel Policies ("Personnel Policies") were passed and approved by the Village Mayor and Board of Trustees on January 4, 2001. The Personnel Policies provides that, "The policies of the Village of Hampshire shall not be construed as a contract of employment. All employees employed by the Village of Hampshire are considered 'at-will' employees." The policies further provide that "All police employees, in addition to these policies, must abide by the police department rules, regulations, policies, and procedures." (Def.'s 56.1(a)(3) Statement ¶ 57).

Neither the Village Board, Mayor Magnussen, Chief Atchison, or McGuire considered the Policies and Procedures in their determination of whether the Board was empowered to discharge Pate and/or Stroyan. The Police Department did not follow the Policies and Procedures when conducting the investigation of Pate and/or Stroyan or in their termination. (Plaint.'s 56.1(b)(3) Statement ¶ 11). In previous cases where police officers had been accused of misconduct, Chief Atchison interviewed the accused. In one instance, a police officer was required to take a polygraph examination. (Id., ¶ 13).

Pate applied for a position as a police officer for the Village of Gilberts subsequent to his termination from Hampshire. Gilberts stated that it had heard that the reason for Pate's termination was for bringing down the morale of the department. Pate does not know who stated this to Gilberts and was not told from whom Gilberts heard it. (Def.'s 56.1(a)(3) Statement ¶ 58).

16

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001).

### Count I - Violation of Due Process Property Interest

Defendants argue that Pate's and Stroyan's violation of due process property interest claims fail because neither had a protected property interest in their continued employment with the Police Department.

To establish a due process claim based on their termination, Plaintiffs must demonstrate: (1) that they had a protected property interest; (2) that they suffered a loss of that interest, amounting to a deprivation; and (3) that the deprivation occurred without due process of law. *See Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007) (*Moss*). Because Plaintiffs were employed in Illinois, the Court looks to Illinois law to determine whether Plaintiffs had a property interest in their employment. *See Moss*, 473 F.3d at 700.

17

Pursuant to Illinois law, a person has a property interest in his job only where he has a legitimate expectation of continued employment based on a legitimate claim of entitlement demonstrated by a specific ordinance, state law, contract, or understanding limiting the ability of the state entity to terminate his employment. *See Moss*, 473 F.3d at 700. An employee handbook or manual that contains a clear promise of continued employment gives rise to legitimate entitlements. However, disclaiming language in a handbook or manual may preclude the formation of an employment contract. *See Moss*, 473 F.3d at 700. An unambiguous disclaimer – including language that the manual "does not constitute a contract of employment in whole or in part" and that the employer "reserves the right to add, amend or delete any benefit or policy stated herein at any time" – is sufficient to show that the manual does not create a legal right. *See Moss*, 473 F.3d at 701. Furthermore, permissive language in the same manual that an employee "may be discharged for cause" does not conflict with the disclaimer and does not create a legal right. Nor does a manual's mandatory notice procedures for termination for cause create an enforceable property right to employment. *See Moss*, 473 F.3d at 701.

The Village's Personnel Policies specifically provides that, "The policies of the Village of Hampshire shall not be construed as a contract of employment. All employees employed by the Village of Hampshire are considered 'at-will' employees." Plaintiffs attempt to refute the language contained in the Personnel Policies through the General Order that provides that punitive discipline "is generally imposed in a progressive manner" and sets forth procedures for the "Review Process."

However, "[a]n employee manual or handbook's procedures do not create an enforceable property right to a job." *Moss*, 473 F.3d at 701, *citing Heck v. City of Freeport*, 985 F.2d 305, 311 (7th Cir. 1993) (stating that [m]ere procedural rights . . . do not themselves give rise to property interests protected under the Fourteenth Amendment.").

Based on the above, Pate and Stroyan did not have a property interest in their employment with the Police Department; and summary judgment is granted in Defendants' favor on Count I.

### Count II - Due Process Liberty Interest

In order for a public employee to establish a claim that his termination implicated a liberty interest to pursue his career, the public employee must establish that: (1) he was "stigmatized" in connection with his employment termination, (2) the stigmatizing information was publicly disclosed, and (3) the employee suffered a tangible loss of other public opportunities as a result of the public disclosure. *See Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794, 801 (7th Cir. 2000) (*Head*). Labeling an employee incompetent or otherwise unable to meet an employer's expectations does not infringe an employee's liberty interest. Charges of professional incompetence do not impose the sort of stigma that actually infringes an employee's liberty to pursue his career. *Head*, 225 F.3d at 801-02. Instead, the employee's good name, reputation, honor, or integrity must be called into question in such a manner as to make it virtually impossible for the employee to find new employment in his chosen field. In other words, "[o]nly if the circumstances of an employee's discharge so sully the employee's reputation or character that the employee will essentially be blacklisted in his or her chosen profession will it be possible to pursue a due process liberty claim." *Head*, 225 F.3d at 801-02.

19

Pate's liberty interest claim is based on his failure to be hired as a police officer in Gilberts and that someone at Gilberts stated that they had heard that the reason Pate was terminated was for bringing down the morale of the Department. Pate does not know who made the statement to Gilberts. Nor has Pate offered any facts that he was not hired because of the statements that were made by the unknown individual. Pate argues that summary judgment should be denied because the above facts establish his claim, and he does not have to demonstrate that one of the present Defendants publicly made the statement. Pate fails to offer any support for his argument that any or all of the present Defendants could be liable for a statement that they did not publicly make.

Based on the above, summary judgment is granted on Count II in Defendants' favor.

### Count III - Violation of First Amendment Right of Free Speech

Under certain circumstances, the First Amendment protects a public employee's right to speak as a citizen about matters of public concern. *See Garcetti v. Ceballos*, ___ U.S. ___, ___, 126 S. Ct. 1951, 1957 (2006) (*Garcetti*); *Connick v. Myers*, 461 U.S. 138, 147-48 (1983) (*Connick*); *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968) (*Pickering*). An employer may not retaliate against an employee for engaging in protected speech. *See Sigsworth v. City of Aurora*, 487 F.3d 506, 509 (7th Cir. 2007) (*Sigsworth*). A two-part balancing test, the *Connick-Pickering* test, is applied to determine if speech is constitutionally protected. Under this test, a public employee establishes that his speech was constitutionally protected if (1) the employee spoke as a citizen on matters of public concern and (2) the employee's interest as a citizen in commenting upon matters of public concern outweighs the State's interest, as an employer, in promoting the efficiency of the public service it performs through its employees. *See Sigsworth*, 487 F.3d at 509. The *Garcetti* Court provided further guidance as to the issue of whether a public employee was speaking as a

20

citizen for First Amendment purposes, holding that "before analyzing whether an employee's speech is of public concern, a court must determine whether the employee was speaking 'as a citizen' or, by contrast, pursuant to his duties as a public employee." *Sigsworth*, 487 F.3d at 509, *citing Garcetti*, 126 S. Ct. at 1960. If the public employee's speech was made pursuant to his official duties, that speech is not constitutionally protected. *See Sigsworth*, 487 F.3d at 509-10 (police investigator's report to his supervisor that he believed suspects were tipped off by some members of the task force was not protected by the First Amendment because it was part of the tasks he was employed to perform); *Spiegla v. Hull*, 481 F.3d 961, 965-66 (7th Cir. 2007) (*Spiegla*) (correctional officer's report of a possible security breach not protected because such report was part of her responsibility as a correctional officer to keep the prison secure); *Crossin v. City of Athens*, 2007 WL 1875998, No. 06-3014, N.D. Ill. June 27, 2007 (City Treasurer's comments about a deposit slip of an unfamiliar account not protected speech because plaintiff was "merely performing her official duties"). In making the determination whether the public employee's speech was made pursuant to his official duties, focusing "on 'core' job functions is too narrow"; instead, the court asks "only whether an 'employee's expressions [were] made pursuant to official responsibilities.'" *Spiegla*, 481 F.3d at 966, *quoting Garcetti*, 126 S. Ct. at 1961. "[T]he inquiry is a practical one" that should focus on "the duties an employee actually is expected to perform." *See Garcetti*, 126 S. Ct. at 1962.

Pate and Stroyan argue that their comments were not made pursuant to their official responsibilities; instead, the comments regarded the subjects of staffing, personnel, or safety/equipment issues. Specifically, Pate and Stroyan criticized the Police Department's failure to properly equip the police officers, the failure of Chief Atchison to assist in staffing calls, the

failure to properly manage and other staffing personnel issues, and the failure of Chief Atchison to maintain relationships with other municipal units that would provide officers with the support they need to do their jobs.

Based on the undisputed facts before the Court, genuine issues of material fact exist as to whether Pate and Stroyan made their comments pertaining to safety and personnel issues (which also may have had an effect on the officer's or the public's safety) pursuant to their official responsibilities. Pate and Stroyan's official duties/responsibilities as Hampshire Police Officers are not fully set forth in the parties' undisputed facts, and whether their comments were made pursuant to their official duties cannot be determined based on the undisputed facts that are before the Court. For example, speaking to other police officers during the shift change about safety issues may be part of a Hampshire Police Officer's official duties; however, based on the undisputed facts before the Court, this determination cannot be made at this time.

Next, the court must determine whether the public employee was speaking on a matter of public concern. Whether speech addresses a matter of public concern depends upon "the content, form, and context of [the speech], as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Of these factors, the content of the speech is the most important. *See Wernsing v. Thompson*, 423 F.3d 732, 751 (7th Cir. 2005). Determining the motivation of the speaker is also important in making the determination of whether the speech is constitutionally protected because speech that is intended to further a private interest or to air a personal employee grievance is not constitutionally protected, even if the speech addresses issues of public interest. *See Metzger v. DaRosa*, 367 F.3d 699, 702 (7th Cir. 2004); *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999); *Nagle v. Village of Calumet Park*, No. 05 C 7039, 2006 WL 3797726 (N.D. Ill Dec. 18, 2006) (*Nagle*). "If the

22

speech concerns a subject of public interest but the *expression* addresses only the personal effect upon the employee, then as a matter of law the speech is not of public concern." *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994).

Plaintiffs argue that their speech that implicated police protection and public safety were matters of public concern. Police protection and public safety are matters of public concern. *See Auriemma v. Rice*, 910 F.2d 1449, 1460 (7th Cir. 1990). Defendants argue that while the speech may have implicated police protection and public safety, the speech was not protected because Plaintiffs were speaking for a purely private motive of trying to improve their own working conditions and/or trying to point out safety issues to get more training for themselves.

Plaintiffs were speaking out on matters of public concern; however, Plaintiffs only voiced their concerns to other police officers within the Police Department and made the statements either while on duty or at shift change. Plaintiffs also concede that at least some of the statements (although it is not indicated which) were made to "vent" or to get things off their chest. Based on the undisputed facts, genuine issues of material fact exist as to whether Plaintiffs' speech was expressed to address only the personal effect upon themselves. Accordingly, it cannot be determined, at this time, whether Plaintiffs' speech constituted protected speech.

Next, Defendants argue that even if the Plaintiffs were speaking on matters of public concern, their speech was not protected because the Police Department's interests outweighed the Plaintiffs' interest in making the speech.

Even if a public employee's speech is of a matter of public concern, a government employer may restrict that speech if its interest in promoting effective and efficient public service outweighs the interest of the public employee as a citizen commenting on the matter. *See Pickering*, 391 U.S.

23

at 568. The "*Pickering* balancing is not an exercise in judicial speculation." *Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002) (*Gustafson*). Instead, this determination "contemplates a highly fact-specific inquiry into" several interrelated factors: (1) whether the speech would create problems in maintaining discipline or harmony among the co-workers; (2) whether the personal loyalty and confidence are necessary in the employment relationship; (3) whether the speech impeded the employee's ability to perform his responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one which was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public. *Gustafson*, 290 F.3d at 909.

The Defendants argue that Plaintiffs' speech created problems in maintaining discipline and harmony among the co-workers and that personal loyalty and confidence are essential in the law enforcement setting. However, genuine issues of material fact exist as to these and other *Pickering* factors. For example, in light of the time between the Plaintiffs' comments and the apparent fact that similar comments were made by other employees who did not receive any type of discipline, it cannot be determined, at this time, if the employer's concerns were legitimate. *See McGreal v. Ostrov*, 368 F.3d 657, 679 (7th Cir. 2004) (presence of genuine issues of material fact as to several of the *Pickering* factors, including whether employer's fear of disruption was legitimate, prevented summary judgment in employer's favor).

Based on the above, summary judgment on Plaintiffs' First Amendment claim (Count III) is denied.

Chief Atchinson and Mayor Magnussen also argue that summary judgment should be granted in their favor because they have qualified immunity.

A two-step analysis is used to evaluate a claim of qualified immunity. *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000) (*Jacobs*). It must be determined first whether the plaintiff's claim states a violation of his constitutional rights and, second, whether those rights were clearly established at the time the violation occurred. *Jacobs*, 215 F.3d at 766. If the rights were not clearly established, the public official is immune from suit; and the claim is dismissed. *Jacobs*, 215 F.3d at 766.

The plaintiff has the burden of demonstrating that a constitutional right is clearly established. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994). A clearly established right is established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Controlling Supreme Court precedent and this circuit's decisions on the issue are reviewed to determine whether a right is clearly established.

"It is well established by the Supreme Court and this circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights." *Miller v. Jones*, 444 F.3d 929, 939 (7th Cir. 2006), *citing Connick*, 461 U.S. 138 (*Miller*). This well- established right has been established under similar factual scenarios present in this case. *See Delgado v. Jones*, 282 F.3d 511 (7th Cir. 2002); *Campbell v. Touse*, 99 F.3d 820 (7th Cir. 1996).

Chief Atchison and Mayor Magnussen argue that in light of the factual complexity of the *Pickering* analysis, neither Chief Atchison nor Mayor Magnussen were put on notice that their termination of Pate's and Stroyan's employment violated their constitutional rights. Under this argument, any time a *Pickering* analysis was required, the public employer would be immune from

25

suit. This argument is "a step too far." *See Miller*, 444 F.3d at 939 (rejecting argument that "no reasonable law enforcement official" may be expected to determine what is appropriate behavior in First Amendment action against the chief of police as "a step too far.").

Chief Atchison and Mayor Magnussen further argue that their actions are protected by the "extraordinary circumstances" exception to the lack of immunity based on their reliance of counsel's advice before terminating Pate's and Stroyan's employment.

If an immunity defense fails because the law was clearly established and a reasonably competent public official should have known the law governing the conduct, the public official may still be immune from suit if extraordinary circumstances exist, such as relying on the advice of counsel in making the disputed decision. *See Davis v. Zirkelbach*, 149 F.3d 614, 620 (7th Cir. 1998) (*Davis*). Factors included in determining whether immunity may be granted based on this extraordinary circumstance include: (1) whether the advice of counsel was unequivocal, (2) whether the advice of counsel was specifically tailored to the particular facts giving rise to the controversy, (3) whether complete information was provided to the advising counsel, (4) the prominence and competence of the advising counsel, and (5) the time span after the advice was received and the disputed action was taken. *See Davis*, 149 F.3d at 620.

In the instant case, the undisputed facts before the Court are insufficient to determine if the extraordinary circumstances defense applies to Chief Atchison's and Mayor Magnussen's decisions to terminate Pate's and Stroyan's employment based on advice from McGuire. For example, its is not clear whether McGuire's advice was unequivocal, especially in light of the Village Attorney's concern about possible civil liability if Pate's and Stroyan's employment was terminated. The facts

26

regarding the timing of the meetings and the actual termination are also not presented in a manner in which the Court can determine the reasonableness of any time-lag between the advice and the actual termination.

Accordingly, summary judgment based on qualified immunity and the extraordinary circumstance defense is denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. Summary judgment is granted as to Counts I and II of Plaintiffs' Complaint and denied as to Count III.

Dated: _10-25-07_

JOHN W. DARRAH
United States District Court Judge